BREWSTER COOPERATIVE GROWERS, *Respondent,* v. BREWSTER
ORCHARDS CORPORATION *et al., Appellants.*[1]

[1]Reported in 150 P. (2d) 847.

*D. A. Shiner* and *Chas. A. Johnson,* for appellants.

*Crollard & O'Connor* and *R. E. Mansfield,* for respondent.

STEINERT, J.—Plaintiff, a corporation, brought suit against two other corporations, as defendants, seeking to compel the latter specifically to perform the sale provisions of a lease and option agreement wherein the defendants were the lessors and prospective sellers, and the plaintiff was the lessee and prospective purchaser, of certain improved real property together with the equipment thereon. Defendants, appearing separately but by the same counsel, filed their answers in which they each denied the material allegations of the complaint and then, by way of an affirmative defense and cross-complaint, sought cancellation of the lease and damages for breach of contract, upon the ground that plaintiff had violated the terms of a marketing agreement previ-

ously made with one of the defendants, to that defendant's damage in the sum of fourteen thousand dollars. Plaintiff replied, denying the material allegations of the respective affirmative defenses and cross-complaints, and in turn affirmatively pleading certain acts and conduct on the part of the defendants in exculpation of any alleged breach by plaintiff of the aforementioned marketing agreement.

The cause was tried to the court without a jury. Findings of fact were made, upon which conclusions of law were predicated, and a decree was thereupon entered awarding to plaintiff the relief prayed for in its complaint, upon certain conditions, however, to be performed by the plaintiff, and denying defendants any recovery upon their cross-complaints. Defendants appealed.

Respondent, Brewster Cooperative Growers, which, for brevity, we shall at times herein refer to simply as "Co-operative" or as "respondent," is a Washington corporation, organized as a co-operative association of independent fruit growers, and is engaged in the business of warehousing, packing, storing, and marketing fruit for its members and also packing and storing fruit for nonmembers. It operates two warehouses in the town of Brewster, Washington, which are designated in the record as "Plant No. 1" and "Plant No. 2," and also a third plant a short distance from the other two. The lease and option agreement referred to herein involves only Plant No. 1. The marketing agreement upon which the appellants' cross-complaints are based involve all, or at least two, of the plants.

Skookum Packers Association, hereinafter referred to as "Skookum," is not directly a party in this litigation but is nevertheless involved by reason of its affiliations and certain of its contracts which will be mentioned later. Skookum also is a Washington corporation, organized as a co-operative association, whose membership is composed of a group of organized co-operative units transacting business in the Wenatchee-Okanogan district. Brewster Co-operative Growers is affiliated with Skookum as one of such co-operative member units. Skookum is engaged in the business of inspecting, advertising, and, either directly

or through a marketing agency employed by it, handling and disposing of the fruit of its unit members. It is financed by remittances from the members to the extent of one cent per box of all fruit sold, over and above the charges payable to its marketing agent on such sales.

Appellant Brewster Orchards Corporation, hereinafter referred to at times as "Orchards," is a Washington corporation, organized in 1937 for the sole purpose of receiving and holding title to the warehouse property involved in the lease and option agreement upon which respondent's action is brought. The entire capital stock of Orchards is owned and held by American Fruit Growers, Inc., the other appellant in the present action.

Appellant American Fruit Growers, Inc., hereinafter referred to as "American," is a Delaware corporation, with a branch office in Wenatchee, Washington. This corporation not only raises fruit of its own in this state but also operates as a world-wide marketing agency for fruit of all kinds grown in the United States and, in normal times, markets fruit both on a national and an international scale.

Northwestern Fruit Exchange, referred to at times herein as "Exchange," was organized as a corporation under the laws of New Jersey, with its general office in Wenatchee, and was a subsidiary of American. For some time prior to 1938, it operated as sales agent for Skookum. On December 31, 1937, at which time all of its capital stock was owned by American, Exchange was dissolved through legal proceedings and all of its assets were transferred to American as a liquidating dividend. On that same day, American, through its president and secretary, executed a certificate reciting that American, as sole stockholder of Exchange and transferee of all of its assets, would continue to do business in Wenatchee under the trade or assumed name of Northwestern Fruit Exchange. This certificate was filed in the office of the county clerk of Chelan county on October 18, 1938.

We have given this synopsis of the creation, existence, and activities of these various corporations in order that the events as hereinafter related may be more clearly un-

derstood. It may be stated here that this litigation, though involving several corporations and individuals, is essentially a controversy between the respondent Co-operative and the appellant American.

On July 1, 1939, respondent Co-operative entered into a lease and option agreement with appellant Orchards whereby the latter leased to Co-operative certain real estate on which was located a cold-storage and warehouse plant (Plant No. 1) in the town of Brewster, together with the office and orchard equipment thereon, for a term of ten years, at an agreed annual rental in a sum equal to four cents per standard packed box, or its equivalent, of all apples and pears *stored in or loaded through the warehouse* (Plant No. 1), provided that the amount of such annual rental should be at least three thousand dollars. The agreement granted to the lessee therein, Co-operative, the privilege or option to purchase the property, at any time before the expiration of the lease, for the sum of twenty-five thousand dollars plus interest at six per cent per annum from August 1, 1939. It further provided that, if Co-operative should exercise its option prior to June 30, 1940, the purchase price would be twenty thousand dollars cash, together with interest at six per cent per annum from August 1, 1939, or if it should exercise its option prior to June 30, 1941, the purchase price would be twenty-two thousand five hundred dollars cash, together with interest at the same rate from August 1, 1939. It was further agreed that, upon the exercise of the option by Co-operative, all sums previously paid as rent should be credited upon the purchase price of the property. American joined in the written instrument as third party, agreeing to perform the proposed terms of sale therein, for the reason that it owned a part of the equipment covered by the agreement.

At the time the present controversy arose, and for some time prior thereto, the property described in the lease and option agreement was subject to a mortgage of fifteen thousand dollars or more, held by one Eugene Enloe and payable at the rate of three thousand dollars a year plus interest at

six per cent per annum. However, the exact date and amount of the mortgage are not shown by the record.

Inasmuch as paragraph eight of the lease and option agreement is the basis of the affirmative defenses and cross-complaints seeking cancellation of the lease and damages for breach of contract, we here set forth its provisions in full:

"It is agreed that so long as this lease is in effect and so long as any indebtedness is owing by Lessee herein [Co-operative] to Lessor herein [Orchards] and/or American Fruit Growers, Inc. that all apples and pears subject to marketing contract with Lessee, *delivered through the above warehouse* [Plant No. 1] shall be marketed through the American Fruit Growers, Inc., doing business as Northwestern Fruit Exchange, according to its standard marketing contract. Failure to make any payment or payments provided for herein or any attempt to sell any portion of said crops, or the whole thereof, otherwise than through the said American Fruit Growers, Inc., doing business as Northwestern Fruit Exchange, as sales agent, without the written consent of said sales agent, shall give to the Party of the First Part [Orchards] the right of cancellation of this lease *and shall mature the whole unpaid balance of any purchase price agreed to be paid for said premises in case said purchase shall have been made by Lessee herein.*" (Italics ours.)

The parties to this agreement operated and dealt with each other thereunder until June 30, 1941. On June 18, 1941, respondent, Co-operative, by letter notified appellants, through Mr. Myron Foster, who was president of Orchards and of Exchange, and also vice-president and regional manager of American, that Co-operative intended to exercise its option to purchase the property described in the lease and option agreement, for the sum of twenty-two thousand five hundred dollars as therein provided, and at the same time inquired of Mr. Foster the exact balance due on the purchase price after assumption by Co-operative of the outstanding mortgage with interest thereon to June 30, 1941.

In reply to the inquiry regarding the amount thus due

and payable, Mr. Foster on June 24, 1941, addressed a letter to Co-operative, reading as follows:

"Replying to your letter of the 18th.

| | |
|---|---:|
| "Balance due on the Contract under Option Agreement, entered into in 1939, will be (as of June 30, 1941) | $18,436.47 |
| "Balance due on the mortgage held by Mr. Enloe as of same date | 14,546.00 |
| "Leaving a net balance due of | $ 3,890.47" |

Under date of June 25, 1941, Co-operative wrote to Mr. Foster concerning certain steps to be taken in closing the purchase transaction, and on the next day American, through Mr. Foster, in reply asserted that Co-operative had failed to market all of its fruit through American, as claimed by him to have been provided in the lease and option agreement, and that Co-operative therefore was not in position to exercise its option to purchase the property. In response to that assertion, Co-operative wrote a letter to Exchange and American, insisting upon its right to exercise the option.

In the meantime, Co-operative had perfected an arrangement with Mr. Enloe, the mortgagee of the property, whereby the mortgagee agreed to release the original mortgagor from further liability on the mortgage on assumption thereof by Co-operative, or else, if the mortgage should be paid by the mortgagor, then Mr. Enloe would take a mortgage from Co-operative for the same amount and upon the same terms.

On June 30, 1941, Orchards sent a telegram to Co-operative, peremptorily canceling the lease and option agreement. Co-operative thereupon instituted this action for specific performance of the option agreement, alleging in its complaint that it always has been, and now is, ready and willing to pay the appellants all sums due and owing as the full purchase price of the property, accept title thereto subject to the outstanding mortgage in the sum of $14,546, and itself procure a release of appellants from further liability thereon; or, in the alternative, is ready and willing to pay the full purchase price of the property in cash upon ap-

pellants' procurement and delivery of a release of the mortgage. After the commencement of the action, Co-operative paid into the registry of the court the sum of $3,890.47, the net amount due from Co-operative, as shown by Mr. Foster's letter of June 24, 1941.

It appears from the evidence that, sometime after July 1, 1941, the exact date not being shown, and after Orchards had peremptorily canceled the lease and option agreement, appellants paid on the principal of the outstanding mortgage the sum of two thousand dollars. This apparently was the balance of an amount of three thousand dollars represented by one of the notes which the mortgage was given to secure. In the decree entered May 4, 1943, awarding respondent Co-operative specific performance of the terms of the option agreement, the trial court ordered and directed that Co-operative pay into the registry of the court the sum of two thousand dollars in addition to the sum of $3,890.47 due under the lease and option agreement as of June 30, 1941.

Appellants' first contention upon the appeal is that the trial court erred in awarding to respondent a decree of specific performance of the option agreement. Two reasons are assigned for this contention: (1) that respondent had violated its contemporaneously existing agreement with appellants to market all of its fruit through American; and (2) that respondent did not make a valid tender of the amount due under the lease and option agreement nor keep the attempted tender good.

■ As appears above, the lease and option agreement provided that during the times therein specified "all apples and pears subject to marketing contract with Lessee [Cooperative], *delivered through the above warehouse* [Plant No. 1] shall be marketed through the American Fruit Growers, Inc., doing business as Northwestern Fruit Exchange." (Italics ours.) This provision of the agreement is separate, distinct, and different from the provisions contained in a series of marketing agreements, hereinafter set forth or mentioned, upon which appellants' cross-complaints are particularly based. The latter provisions are broader in scope than that above quoted, for by the terms of

these marketing agreements American was made the exclusive marketing agency of *all* fruit grown by Co-operative or coming into its possession (whether in Plant No. 1 or in any other plant) as owner, agent, or broker; whereas the lease and option agreement has reference only to fruit delivered through Plant No. 1. For the present, however, we confine our consideration solely to the relevant provision contained in the lease and option agreement.

The trial court found, and its finding is amply supported by the evidence, that in 1939 Co-operative was obligated by the lease and option agreement to deliver to American, through Plant No. 1, 82,603 boxes of fruit, being the total pack-out for that plant during that year, and that it did deliver to American 144,320 boxes of fruit, thereby more than fulfilling its obligation for the year 1939; and that in 1940 Co-operative was obligated to deliver to American, through Plant No. 1, 75,880 boxes of fruit and actually did deliver 88,829 boxes, likewise more than fulfilling its obligation for the year 1940. We agree with the trial court in its holding that Co-operative did not violate paragraph eight of the lease and option agreement, which constituted American the marketing agency for fruit delivered through Plant No. 1.

Approaching the same matter from a somewhat different point of view, the trial court also made the following finding:

"No notice or election of the defendants [appellants] pertaining to any claim they now make in this action to have cancelled the lease and option was made or given by said defendants prior to plaintiff [Co-operative] exercising its election to purchase, and if any defaults by plaintiff had existed pursuant to which defendants might have asserted any right to cancel said lease, such defaults were waived and cannot be relied upon to defeat plaintiff's rights after its exercise of the option. The contract provision pertaining to defendants' claimed right of cancellation provided that its right to make such cancellation 'shall mature the whole unpaid balance of any purchase price agreed to be paid for said premises in case said purchase shall have been made by lessee herein [Co-operative].' "

This finding is also supported by the evidence. In its memorandum opinion the trial court made this apt comment on that point:

"If the contract had been broken by plaintiff [Co-operative] prior to notice by it that the plaintiff would exercise its option to purchase, it seems that defendant [appellants] would, at the time of default by plaintiff, have exercised its right under the contract, and cancelled it. The fact that defendant found no reason to cancel the contract, waived defaults, if any existed, until plaintiff sought to exercise its option to purchase, and then by telegram, Exhibit 10, sought to cancel the contract, hardly squares with equity, good conscience and fair play."

We may add that, in our opinion, the right of cancellation which was reserved in paragraph eight of the lease and option agreement must be construed as giving Orchards and American a right to cancel the lease, but with the result that the exercise of such right *ipso facto* matured the whole unpaid balance of the purchase price as fixed by the terms of the agreement. That, in effect, is the very situation with which Co-operative is now confronted and with which it has been, and is, at the same time ready and willing to comply, even if it be assumed that it had previously violated any provision of the agreement.

■■ In their brief, appellants do not advance any argument with reference to the alleged insufficiency or invalidity of respondent's tender of performance. In our opinion, the tender as offered in and by the complaint was sufficient in form, manner, and amount. The tender having been made, and the action being an equitable one, it was not necessary to keep the tender good by paying the amount thereof into court, although that was subsequently done. In such an action, it is sufficient if the money is paid into the official registry when so directed by the court. *Dare v. Mount Vernon Inv. Co.*, 121 Wash. 117, 208 Pac. 609; see, also, *Murray v. O'Brien*, 56 Wash. 361, 105 Pac. 840, 28 L.R.A. (N.S.) 998. Furthermore, it is not necessary to keep a tender good when the party for whose benefit the tender has been made repudiates the contract, because the law will not compel anyone to do an idle thing. *Bruggemann v. Converse*, 47 Wash.

581, 92 Pac. 429; *Gibson v. Rouse,* 81 Wash. 102, 142 Pac. 464; *Calhoun, Denny & Ewing v. Pederson,* 85 Wash. 630, 149 Pac. 25.

In support of their contention that Co-operative breached its contract thereby depriving it of the right to specific performance and subjecting it to damages as prayed for in the cross-complaints, appellants place their principal reliance upon a series of three written marketing agreements antedating the lease and option agreement but operative during the period with which we are here concerned. These marketing agreements, which were introduced in evidence by the appellants, go to the very root of the controversy here involved. It is therefore necessary that we give them particular attention.

The first of these agreements, which is in printed form, was executed by and between Co-operative and Skookum under date of June 9, 1937. By that agreement Co-operative became a unit member of Skookum. In its designation of the contracting parties thereto, Co-operative is referred to as the "Shipper," and Skookum is termed the "Association." The agreement provides, among other things, as follows:

"SHIPPER and ASSOCIATION being desirous of obtaining the mutual benefits to be derived from the economical purchase of supplies, the standardization and advertising of the grade and pack of SHIPPERS apples, and their sale through one marketing agency under the SKOOKUM trademarks and brands owned by ASSOCIATION, therefore agree as follows:

"SHIPPER AGREES:

"1. To deliver to the ASSOCIATION, or its order for sale all apples except culls; also such other horticultural and agricultural products as may be covered by special contract which shall be mutually satisfactory to the ASSOCIATION and the SHIPPER, *grown by it or coming into its possession either as owner, agent, or broker for sale,* delivery thereof to be made f. o. b. cars at Brewster, Washington.

"2. The said apples and other horticultural and agricultural products shall be sold by the ASSOCIATION *or any marketing agency selected by it,* together with the apples and other horticultural and agricultural products of other mem-

bers of the ASSOCIATION through such channels and upon such terms and conditions as the Board of Trustees of ASSOCIATION may from time to time determine, and ASSOCIATION *or its marketing agency* is hereby authorized to deduct or cause to be deducted from the proceeds of sale *the selling costs thereof,* together with the inspection, advertising and administrative charges hereinafter provided [one cent per box for each box of apples sold] and such other sums as may be lawfully due Association *or its marketing agency.* . . .

"8. To furnish ASSOCIATION *or its marketing agency,* in the case of any direct sales made for cash pursuant to the terms hereinafter set out, an exact copy of the original invoice to the buyer showing car number, contents and price; also to pay ASSOCIATION *or its marketing agency* the fees in such cases hereinafter provided. . . .

"10. Should the SHIPPER violate the exclusive selling authority hereby granted to ASSOCIATION by disposing of its products or any part thereof in a manner not specifically provided in this agreement, SHIPPER hereby agrees to pay to ASSOCIATION *or its marketing agency for all products delivered, sold (except as hereinbefore provided), consigned or marketed by or for it,* otherwise than through ASSOCIATION as hereinafter provided for, *as liquidated damages for such breach of contract,* an amount equal to the fees ASSOCIATION *or its marketing agency* would have received had the sales been made by it pursuant to the terms of this contract.

"MUTUAL COVENANTS: . . .

"3. If the ASSOCIATION employs a marketing agency, the latter shall deduct from the proceeds of sales its selling charges and other sums due it, together with all moneys due from the SHIPPER to the ASSOCIATION and the balance remaining in its hands shall be paid over to the SHIPPER. . . .

"5. Nothing herein contained or any agreement between the ASSOCIATION *and any marketing agency employed by it,* shall prevent the SHIPPER from selling his apples and other horticultural and agricultural products to spot buyers for cash at any time prior to delivery of said products to the ASSOCIATION *or its marketing agency;* provided, however, that in case of cash sales to spot buyers the SHIPPER will pay the ASSOCIATION *or its marketing agency* one-fourth the normal selling charge and all other charges in full—the same to be deducted from the proceeds of other sales made by ASSOCIATION *or its marketing agency.* . . .

"15. This contract shall continue for a term of five years from and after the date hereof, and shall automatically continue for succeeding terms of five years thereafter, unless [sixty days' written notice of cancellation be given]. . . .

"17. It is hereby expressly agreed, however, that SHIPPER *may execute a direct marketing contract* with the agency with which ASSOCIATION has a marketing contract or otherwise arrange the marketing of SHIPPER's fruit through such agency, *but such marketing arrangement must be upon the same general terms and conditions as provided in* ASSOCIATION's *marketing contract.* . . .

"The mutual covenants and agreements in this contract set forth shall be binding not only upon the parties hereto, but also upon their respective personal representatives, successor or assigns." (Italics ours.)

The second of these marketing agreements was executed by and between Co-operative and Exchange on July 7, 1937. This agreement, which was in printed form, is in its general contents quite similar to, and consistent with, the Co-operative-Skookum contract from which we have already quoted at length, although it did not contain a specific provision similar to paragraph five of the mutual covenants of the earlier contract permitting Co-operative to make cash sales, on which the marketing agency would be paid only one-fourth of the normal selling charges. However, it did contain this typewritten provision inserted in the otherwise printed form:

"It is further agreed that for any year that the Brewster Co-operative Growers is a member of the Skookum Packers Association and the marketing contract between the Skookum Packers Association and Northwestern Fruit Exchange specifies a different selling charge than the charges called for in this agreement, then in that event the charges as stated in the agreement between the Skookum Packers Association and Northwestern Fruit Exchange shall apply to this agreement."

In this second agreement Co-operative appointed Exchange its exclusive agent to sell and collect the proceeds from sales of *all fruits shipped which should come into possession or control of Co-operative,* "either as owner, agent or broker, during the continuance of this contract

[having a term of three years, with provision for automatic extension]." It also provided that if Co-operative should violate the exclusive selling authority by disposing of its products otherwise than as provided in the agreement, Co-operative would be required to pay to Exchange, *as liquidated damages,* an amount equal to the fee which Exchange would have received had the sales been made by it. It is upon this last-mentioned provision that the appellants are relying for recovery under their cross-complaints. The agreement then provided that the compensation to be paid to Exchange for its services in making standard sales should be the sum of ten cents per box of apples.

The third agreement, which was in typewritten form, was executed between Exchange and Skookum on March 24, 1939. By this agreement, Skookum appointed Exchange as its exclusive agent to sell and collect for all horticultural and agricultural products coming into the possession or control of Skookum as owner, agent, or broker during the continuance of the contract (a term of five years). It also provided that Exchange should deal directly with the unit members of Skookum. It further contained a provision similar to those above with reference to liquidated damages for breach of contract by Skookum. We quote the following provisions in the agreement:

"FACTOR [EXCHANGE] AGREES: . . .

"3. NO DISCRIMINATION TOWARDS CASH SELLER: To exercise no discrimination against or penalize any Member selling for cash in accordance with terms of this contract in any way through an equal or unfair pro-rating of orders on remaining unsold fruit and to treat and deal with such Member in exactly the same impartial and courteous manner in all respects as though such Member had sold no fruit for cash.

"SPECIAL SALES: On sales made by ASSOCIATION [Skookum] (or its Members) for cash direct to spot buyers, the rate of compensation shall be two and one-half cents ($2\frac{1}{2}\cent$) per box, . . . Spot sales as made by ASSOCIATION (or its Shippers) is interpreted as cash against the documents at shipping point or at Wenatchee."

It will be noted that this last provision harmonizes with

paragraph five of the mutual covenants of the first agreement, as quoted above.

As contended by appellants, these three marketing agreements must be read and considered together as constituting the marketing contract between American and Co-operative. The essential provisions thereof, so far as the issues herein are concerned, are the following: (1) Co-operative was obligated to deliver to Skookum or its marketing agency all fruit grown by Co-operative or coming into its possession or control as owner, agent, or broker; (2) American was made the marketing agency for Skookum and its unit members, including Co-operative; (3) the compensation to be paid to American for standard sales consummated by it was ten cents a box; (4) violation by Co-operative of the exclusive selling authority given to American subjected Co-operative to the payment of the same amount, ten cents a box, "as liquidated damages," or, according to respondent's contention, as a "penalty"; (5) Co-operative retained the right, under the terms of the marketing contract, to sell its products direct to buyers for spot cash; (6) on such cash transactions or special sales the compensation to be paid to American was two and one-half cents a box.

Appellants alleged in their cross-complaints, and now contend that the evidence shows, that during the years 1939 and 1940 respondent sold "outside" approximately 140,000 boxes of apples, in violation of its marketing contract, and that appellants are therefore entitled to recover for such breach "liquidated damages," as provided in the agreement, on the basis of ten cents for each box of fruit so sold by respondent, or total damages in the amount of fourteen thousand dollars.

The trial court found that, under respondent's contract to market through American all fruit handled by Co-operative for marketing during 1939, the latter had so handled 142,940 boxes; that it actually delivered to American 144,320 boxes; and that therefore respondent had not breached its marketing contract in that year. The court further found that in 1940 respondent handled for marketing 140,244 boxes of fruit, but had delivered to American only 88,829 boxes,

and that therefore it had failed in 1940 to comply with its marketing contract to the extent of 51,415 boxes. These findings of the trial court are amply supported by the evidence.

The court refused, however, to allow to appellants damages for the shortage of delivery in 1940, at the rate of ten cents a box as provided in the marketing agreement, on the ground that so to apply that provision would, under the circumstances, make it a "penalty" rather than "liquidated damages." This ruling was based on uncontroverted evidence to the effect that appellants' expenses when they sold fruit amounted to approximately four cents, or even more, per box and that their actual damages in this instance could in no event have exceeded more than six cents a box. It can thus be seen that, if appellants were allowed to recover the full amount for fruit not delivered to them, and therefore not sold by them, they would realize a greater compensation thereon than if the fruit had actually been delivered to, and sold by, them.

The trial court also refused to apply the two and one-half cent rate to the amount of fruit sold "outside" by the respondent, on the ground that appellants' cross-complaints did not constitute actions *on the contract to recover the compensation as provided therein,* but were simply actions *for damages for breach of contract,* and that respondent has had no opportunity to meet an issue of its liability on the two and one-half cent rate applicable to fruit sold by respondent direct to outside buyers.

The evidence discloses that in 1941 Co-operative and the growers of which it was composed became very much dissatisfied with the services being rendered by American. They complained not only that American was not securing the f. o. b. orders that it should, under the terms of the marketing agreement, but also that in making sales it was discriminating in favor of its own fruit as against that of Co-operative, and further that on sales to purchasers it was allowing deductions ruinous to Co-operative and the growers. In consequence of this alleged treatment, Co-operative began selling quantities of fruit direct to cash buyers.

When American learned of this practice on the part of Co-operative, it in turn began making complaints, insisting that under its marketing agreement it was entitled to handle and dispose of all the fruit coming into the possession or control of Co-operative. These charges and counter-charges were the subject of much dispute and altercation between the parties. Finally, in April, 1941, the representatives of American and of Co-operative met for the purpose of discussing and settling their various difficulties. While there is a dispute in the testimony as to what occurred at that meeting, the preponderance of the evidence, in our opinion, is to the effect that it was then and there agreed that past differences would be forgotten and that in the future, whenever Co-operative desired to sell its fruit direct to purchasers, it would first offer it to American, and if American did not meet the prices that Co-operative could otherwise obtain, then Co-operative would be free to sell to other buyers, without being subject to a charge of violation of its marketing agreement with American. Touching that feature of the case, the trial court made the following finding:

"The contracts exhibits 12 and 17, pursuant to which plaintiff [Co-operative] delivered fruit to American Fruit Growers for marketing provided that fruit not sold thru American should be offered to it and if it could not meet prices, the plaintiff was at liberty to sell, and that such sales were not in violation of the contract; the method of operation by which plaintiff made sales was approved of by American, although such approval was not given to each individual sale."

In its memorandum opinion, the trial court also made a thorough analysis of the marketing agreements, from which we have quoted at length above, and came to the expressed conclusion that the whole series of these agreements contemplated direct sales by Co-operative and that such sales were not in violation of the marketing agreements with American.

A careful study of a lengthy, and somewhat confusing, record convinces us that the trial court was correct in these findings and conclusions; that the marketing agreements

contemplated direct sales by Co-operative; that such direct sales did not violate appellants' exclusive marketing agency agreements; and that the program under which Co-operative made such sales was approved by American. This interpretation of the record brings the controversial situation within that provision of the marketing agreements which fixed the compensation to be allowed to American on a basis of two and one-half cents a box, and eliminates from consideration the provisions calling for "liquidated damages" on the basis of ten cents a box. Since the latter provisions are thus eliminated, it is immaterial whether they be considered as constituting a "penalty" or as "liquidated damages."

As stated before, however, appellants are not seeking in this action to recover, as their compensation under the agreement, two and one-half cents a box for all fruit sold directly by Co-operative, but, rather, are seeking to recover damages in the sum of ten cents a box for failure of Co-operative to deliver to them a certain number of boxes of fruit. In other words, they are not suing, in their cross-complaints, *upon the contract,* but are attempting to maintain an action for *breach of contract,* seeking to recover *damages,* rather than their *contractual compensation.* Furthermore, as also stated above, respondent has had no opportunity either to meet that issue or to present its counterclaim for damages for improper handling and disposition of its fruit by American. The cross-complaints will therefore have to be dismissed.

In their brief, appellants argue that the decree will leave them still primarily liable on the outstanding notes secured by the mortgage on the property. The decree requires respondent to assume, pay, and discharge the mortgage indebtedness according to its terms. In the course of the correspondence relative to respondent's intention to exercise its option, appellants assumed, without raising any apparent objection to such procedure, that respondent would take over the obligation to pay the balance due upon the existing mortgage and accept a deed subject thereto. It also appears from the evidence that the mortgagee has ex-

pressed his willingness to satisfy the existing mortgage and accept from respondent a new note, or notes, and mortgage covering the balance due. We do not find that this matter of appellants' continuing liability on the mortgage was ever called to the attention of the trial court, nor do we believe that it is presently of any serious concern to them. In any event, we hold that, under the circumstances shown, appellants cannot now object to the failure of the court to cover this particular point in its decree.

By one of their assignments of error appellants contend that the court erred in not allowing them interest after June 30, 1941, on the sum of $3,890.47, which was the balance of the purchase price payable on that date as computed by appellants themselves. Respondent was ready and willing to pay that amount on that date, but was prevented from so doing by appellants' unwarranted refusal to perform the lease and option agreement according to its terms. When a purchaser makes a tender sufficient to entitle him to specific performance of a contract, interest ceases to run. *Tacoma Water Supply Co. v. Dumermuth,* 51 Wash. 609, 99 Pac. 741. Since respondent has at all times been ready and willing to pay the full amount owing on the contract and appellants have continuously refused to accept that amount or to perform their obligation under the contract, appellants are not entitled to interest on the original amount due them.

Finally, appellants contend that the trial court erred in finding and deciding that they were not entitled to recover interest on the sum of two thousand dollars, which was the amount paid by the appellants on the mortgage sometime subsequent to July 1, 1941. There is no evidence, however, as to the exact date of such payment. The court did not refuse to find and decide as appellants now claim it should have, but merely failed to do so. We are of the impression that the court's "failure" in that respect is due to the fact that its attention was not called directly to that point at the time the findings were signed and entered, and probably also to the fact that the date of such payment was

not shown. Touching this matter, the trial court stated in its memorandum opinion:

"Plaintiff [Co-operative] has paid the Clerk of this Court $3,890.47, the amount due above the mortgage June 30, 1941, and will pay to said Clerk for defendant in addition, within thirty days after entry of judgment, $2,000.00 since paid by the defendant [Orchards] on the mortgage, *and interest on $14,546.00* [the total amount due on the mortgage on June 30, 1941] at the rate specified in the mortgage, from June 30, 1941, to the date of payment."

Apparently the trial court intended by this statement that respondent should pay interest on at least the entire balance of principal of the mortgage as it stood on June 30, 1941, which would of course include the two thousand dollars subsequently paid by appellants to the mortgagee. At any rate, we believe that the decree should have so provided. Under respondent's own theory, it would be required to assume the outstanding mortgage as of June 30, 1941, and pay the interest on the whole principal from that date. Since appellants have made a payment of two thousand dollars on the principal, they should receive the same amount of interest thereon as the mortgagee himself would have been entitled to receive had that amount not been so paid. The decree will therefore be modified to the extent of allowing appellants interest on two thousand dollars from the date such amount was paid by them to the mortgagee until the respondent shall have paid a like amount into the registry of the court. However, in view of the fact that this deficiency in the decree was occasioned partly through the fault of appellants themselves, such modification will not affect respondent's right to recover costs on appeal.

For the reasons and upon the grounds hereinbefore stated, the decree of the trial court will stand affirmed with the modification referred to above.

MILLARD, ROBINSON, JEFFERS, MALLERY, and GRADY, JJ., concur.

BEALS, J. (concurring in the result)—Appellant Brewster Orchards Corporation filed its answer to respondent's complaint, and by way of a cross-complaint asked for cancellation of respondent's lease and option. Appellant American Fruit Growers, Inc., in its answer, also by way of cross-complaint, asked for cancellation of the option, and by its second and third cross-complaints asked respectively for judgment against respondent for the sums of four thousand dollars and ten thousand dollars, because of respondent's alleged failure to turn over to appellant American 140,000 boxes of apples which appellant alleged respondent should have turned over to appellant for handling. In appellant's cross-complaint it also asked for general relief. Both in its pleadings and during the course of the action and during the prosecution of its appeal, appellant American relied, as the basis for the recovery sought upon its second and third cross-complaints, only upon those portions of its contracts with respondent providing for the payment of ten cents a box as alleged liquidated damages for any breach on the part of respondent of its contract to deliver apples. I do not find that anywhere during the prosecution of the action, appellant American asked for damages on the basis of two and one-half cents per box. The portion of the contract providing for such a payment was, of course, discussed and noted by the trial court in its memorandum opinion, but it seems to me that appellant American at all times stood upon the proposition that it was entitled to recover, under the liquidated damages paragraphs of the contract, ten cents a box for all apples not delivered to it by respondent.

Appellant's cross-complaints were, of course, based upon the contract, in that appellant sought to recover liquidated damages as provided therein.

It is my opinion that, in providing for the payment by respondent to appellant American of ten cents per box in accordance with the terms of the contract set forth in the majority opinion, the payment called for constituted a penalty and not liquidated damages. Appellant American was to receive from respondent the same amount for not

handling boxes of apples as it received for handling. It clearly appears from the evidence, and indeed is admitted, that each box of apples handled by American cost the latter several cents per box, certainly as much as four cents a box.

In the early case of *Krutz v. Robbins,* 12 Wash. 7, 40 Pac. 415, 50 Am. St. 871, 28 L.R.A. 676, this court said:

"The courts, however, have deduced from the authorities certain general rules, 'each having more or less weight according to the peculiar circumstances of each case.' Among these rules is one which is almost universally recognized and acted on, and which is that where the payment of a smaller sum is secured by an agreement to pay a larger sum, the larger sum will be held a penalty and not liquidated damages."

In the case at bar, there is no question concerning an agreement to secure by a larger sum the payment of a smaller sum, but the principle is the same, as, if appellant American is allowed to recover ten cents a box as liquidated damages, it will secure and retain a considerably larger amount than it would have earned as profits by the carrying out of the contract.

The cases of *Madler v. Silverstone,* 55 Wash. 159, 104 Pac. 165, 34 L.R.A. (N.S.) 1, and *Smith v. Lambert Transfer Co.,* 109 Wash. 529, 187 Pac. 362, are also in point.

While in the instant case it may be conceded that the actual damages suffered by appellant American upon breach of the agreement to deliver fruit for marketing would be difficult to ascertain, and that in such a contract as that of the parties to this action it would be proper to agree upon a certain sum as liquidated damages, nevertheless the amount fixed by the contract, which bears no relation whatever to the actual loss of profits by American, is so disproportionate to the actual damage which could possibly have been suffered by appellant American from any breach of the contract that the agreement must be held to call for the payment of a penalty, rather than for the payment of liquidated damages.

It should also be noted that in one instance the payment sought by appellant American is directly referred to in the contract as "penalty for breach of contract."

It is the rule that, if the meaning of a provision in a contract for the payment of damages is doubtful, it will be considered that the payment of a penalty is intended. *Tayloe v. Sandiford,* 7 Wheat. (20 U. S.) 13, 5 L. Ed. 384; Sedgwick on Damages (9th ed.), vol. 1, p. 780, §§ 407-8.

In the case at bar, appellant American cross-complained for damages in accordance with the terms of the contract, claiming contract, and not actual, damages. Concerning this phase of the case, the trial court found:

"The relief claimed by American for failure of the plaintiff to market 51,415 boxes in the year 1940 is to recover the sum of ten cents per box as alleged liquidated damages. Such sum of ten cents per box, on the evidence submitted to the court, manifestly exceeds the compensation said defendants would have recovered if such fruit had been sold thru said defendant and is, therefore, found and determined to be a penalty and not liquidated damages, and the amount of such penalty is so disproportionate to the actual damages suffered as to be unconscionable and there is a failure of proof as to any damages suffered by said defendant."

This finding is amply supported by the evidence. It appears from the testimony of appellant's officers that on many of the cars of apples which it sold in the east it paid out of the ten cents a box which it received from respondent a brokerage charge averaging between three and four cents a box; that on other carloads not sold through a broker it paid an auction charge in about the same amount; that besides these expenses there were other sale costs connected with the actual marketing of the apples which could not properly be considered part of the general sales campaign expense.

I am of the opinion that appellant American, by its second and third cross-complaints, sought recovery which the trial court correctly held to amount to a penalty, and in no sense liquidated damages, and that, in holding that the amount specified in the contract constituted a penalty rather than liquidated damages, the trial court was right.

I concur with the majority in holding that the trial court properly decreed specific performance in respondent's

favor of the contract upon which it sued, and I concur also with the majority in affirming the decree appealed from, dismissing appellant American's cross-complaints.

SIMPSON, C. J., and BLAKE, J., concur with BEALS, J.